

#300067176

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

U.S. DISTRICT COU...
NORTHERN DISTRICT OF TEXAS
FILED

AUG 16 2023

CLERK, U.S. DISTRICT COURT
By___CL___
Deputy

**CHRISTOPHER LACCINOLE**
*Plaintiff*

Vs.                                           **C.A. No.:**

**DON WOOD**
&
**ANDREW STEFANIDES,**                        **JURY TRIAL REQUESTED**
&
**AMERICAN COALITION FOR CRISIS
RELIEF PAC,**
&
**CRISIS RELIEF CONSULTANTS, INC.**
*Defendants*

3-23CV-1831L

## COMPLAINT

### I.  INTRODUCTION

This is a civil action about two men—Dr. Don Wood and Andrew Stefanides—who

run a scam political action committee (SCAM PAC) to fleece consumers of money for an

ostensibly noble cause, while Wood and Stefanides pocket the money for themselves and

their business partners.  In order to obtain money, Defendants place unauthorized robocalls

to consumers like Plaintiff using an artificial or prerecorded voice on behalf of fake entities

such as "Breast Cancer Relief Committee," or "Veterans Crisis Relief Fund."  In these calls,

Defendants repeatedly claim that the money goes to "life-saving treatment" for women with

breast cancer.  In reality, **none of the money paid to American Coalition for Crisis Relief**

**PAC ("ACCR") goes to any treatment for women with breast cancer.  None of the**

**ACCR money goes to treat Veterans with PTSD**.  And ACCR is not running a small

1

enterprise. Since being founded in June of 2019, ACCR collected $7,098,332.[1] Where do all these millions of dollars go? Back to Wood, Stefanides, and their fundraisers.

Recently, media outlets reported that these scams have become so bad that the Federal Election Commission finally took action to stop SCAM PACS: "In a rare case of bipartisan unity, the Federal Election Commission this week unanimously urged lawmakers to tackle so-called "scam PACs" that claim to support a political candidate but end up enriching the founders and their friends."[2]

Defendants claim their business is headquartered in Texas, but they never registered for a business license in Texas. This is deliberate. Defendants want to conceal their misdeeds and hamstring any accountability or compliance regime. This needs to stop.

## II.  NATURE OF THE ACTION

1. Defendants Wood, Stefanides, and ACCR PAC solicit consumers to pay for life-saving treatment for women with breast cancer. As a primary part of their marketing efforts, Defendants placed thousands of calls employing an artificial or prerecorded voice message to cell phones and residential phones nationwide.

2. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written

---

[1] See: https://docquery.fec.gov/cgi-bin/fecimg/?C00709113; Accessed July 17, 2023.
[2] See https://www.businessinsider.com/fec-asks-congress-to-take-action-on-scam-pacs-2022-12. Accessed July 16, 2023.

agreement must be obtained "without requiring, directly or indirectly, that the
agreement be executed as a condition of purchasing any good or service."
*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C.
Rcd. 1830, 1844 (2012) (footnotes omitted) ("the FCC Letter").

3.    Defendants did not obtain consent prior to placing these calls and, therefore, are in
      violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

4.    The TCPA is a remedial statute that was passed to protect consumers from
      unwanted prerecorded telephone calls in response to complaints about increased
      telemarketing. See S. Rep. 102-178, at 1, 5 (1991).

5.    Congress enacted the TCPA in 1991 to restrict telemarketing equipment that could
      target millions of consumers *en masse*. Congress found that these calls were not only a
      nuisance and an invasion of privacy to consumers specifically but were also a threat
      to interstate commerce generally. See S. Rep. No. 102-178, at 2-3 (1991).

6.    Despite such strong legislation passed almost 30 years ago, this problem worsens
      with each year.

7.    According to online robocall tracking service "YouMail," 4.9 billion robocalls were
      placed in June 2023 alone, at a rate of 161.9 million calls per day
      www.robocallindex.com;(last visited July 17, 2023).

8.    The FCC received an overwhelming number of complaints about unwanted calls,
      with 150,000 complaints in 2016, 185,000 complaints in 2017, 232,000 complaints in
      2018, 192,000 complaints in 2019, 156,000 complaints in 2020, and 161,000
      complaints in 2021. FCC, Consumer Complaint Data Center,
      www.fcc.gov/consumer-help-center-data; (last visited July 17, 2023).

9.    "Unwanted calls – including illegal and spoofed robocalls - are the FCC's top
      consumer complaint and our top consumer protection priority." FCC press release,

Cutting off Robocalls; (July 25, 2022), statement of FCC.

10.   "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016).

11.   The TCPA targets unauthorized calls exactly like the ones alleged in this case, based on Defendants' use of technological equipment to spam consumers with their telephone solicitations on a grand scale.

12.   By placing the calls at issue, Defendants have violated the privacy and statutory rights of Plaintiff.

13.   Plaintiff therefore seeks an injunction requiring Defendants to stop their unconsented calling.

14.   The Plaintiff brings this action alleging the Defendants violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 (hereinafter "TCPA"). The Plaintiff seeks statutory damages and injunctive relief under the TCPA.

15.   The Plaintiff also alleges that Defendants' conduct violated the Texas Business and Commerce Code § 302.101 and § 305.053. The Plaintiff seeks statutory damages, costs, attorney's fees, and injunctive relief for each Defendant under Texas law.

16.   Plaintiff has no pre-existing business relationship with the Defendants and never requested by an agreement or otherwise that he be contacted.

17.   Any violations by Defendants were knowing, willful, intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

4

### III. JURISDICTION AND VENUE

18. This Court has jurisdiction to hear the TCPA claims in this matter pursuant to 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5).

19. This Court has jurisdiction to hear Plaintiff's state law claims pursuant to Tex. Bus. & Com. Code § 17.50.

20. This Court has personal specific jurisdiction over Defendants because Defendants reside in Texas and target consumers with their solicitations from Texas, including to Plaintiff, who resides in Texas.

21. Defendants' marketing towards residents of Texas is the subject of this dispute from which this lawsuit arises.

22. Venue in this County is proper pursuant to 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5) because the Defendant is a resident of this District in Dallas, TX, and the conduct complained of took place in this District.

### IV. BIRTH OF A SCAM

23. Upon information and belief, Don Wood goes by the moniker Dr. Don Wood, and holds himself out to the public in Florida as a psychologist and "healer." See: https://www.drwoodphd.com/about-me; Accessed July 17, 2023.

24. Dr. Don Wood does not have any Florida license to practice as a psychologist or as a mental health counselor. See: https://mqa-internet.doh.state.fl.us/MQASearchServices/HealthCareProviders; Accessed July 17, 2023.

25. Dr. Don Wood claims that he pioneered a therapeutic technique so revolutionary that it permanently cures post traumatic stress in only four hours. See:

5

https://www.inspiredperformanceinstitute.com/how-tipp-works/; Accessed July 17, 2023.

26. Dr. Don Wood further claims that he permanently healed "his daughter's Crohn's disease and his wife's autoimmune disease" through his "cutting-edge" technique. See: https://www.drwoodphd.com/about-me; Accessed July 17, 2023.

27. As part of Dr. Don Wood's medical practice, he built a Florida company called Crisis Relief Network that began treating trauma survivors (despite not having a medical license to do so).

28. The Crisis Relief Network claims through a testimonial that, "A lady who had experienced severe childhood sexual abuse and was living with deep depression wrote to us a few days after her two-hour session and said 'You saved my life, thank you, thank you. thank you'. Priceless!" See: https://web.archive.org/web/20230531231932/https://crisisreliefnetwork.org/about-us/; Accessed July 17, 2023.

29. Despite the amazing (and incredible) results, Dr. Don Wood was not satisfied with his healing powers, so he sought to diversify his offerings under a political action committee and a new company called "Crisis Relief Consultants, Inc."

30. On June 13, 2019, Don Wood files paperwork with the Federal Election Commission establishing the "American Coalition for Crisis Relief PAC." See: https://docquery.fec.gov/cgi-bin/forms/C00709113/1333918/.

31. Just a few days after Dr. Don Wood founded ACCR, he then founded Defendant Crisis Relief Consultants, Inc. ("CRC") as a Florida entity in July of 2019. See Exhibit A: Articles of Incorporation for Crisis Relief Consultants, Inc.

32.     The purpose of Crisis Relief Consultants, Inc. was to act as a pass-through, for-profit entity to siphon money from the ACCR for "PAC Management Services."

33.     Since inception, ACCR has reported to the Federal Election Commission the following disbursements to Crisis Relief Consultants, Inc:[3]

| Date | Payment to Crisis Relief Consultants, Inc. |
|------|---------------------------------------------|
| March 4, 2020 | $7,500.00 |
| March 6, 2020 | $7,500.00 |
| March 13, 2020 | $5,000.00 |
| March 31, 2020 | $7,500.00 |
| April 30, 2020 | $5,000.00 |
| June 26, 2020 | $7,500.00 |
| June 26, 2020 | $7,500.00 |
| August 14, 2020 | $2,500.00 |
| October 1, 2020 | $10,000.00 |
| November 30, 2020 | $3,176.48 |
| January 29, 2021 | $6,594.35 |
| February 9, 2021 | $10,000.00 |
| March 12, 2021 | $10,000.00 |
| April 15, 2021 | $7,500.00 |
| June 3, 2021 | $10,000.00 |
| September 24, 2021 | $42,500.00 |
| December 16, 2021 | $17,500.00 |
| January 13, 2022 | $20,000.00 |
| February 1, 2022 | $5,000.00 |
| February 4, 2022 | $7,500.00 |
| March 3, 2022 | $7,500.00 |
| March 7, 2022 | $7,500.00 |
| April 1, 2022 | $20,000.00 |
| April 28, 2022 | $10,000.00 |
| July 1, 2022 | $15,000.00 |
| August 8, 2022 | $10,000.00 |
| October 31, 2022 | $10,000.00 |
| December 14, 2022 | $5,000.00 |
| February 15, 2023 | $25,000.00 |
| **TOTAL** | **$309,770.80** |

34.     Upon information and belief, these "PAC Management Services" were not to

---

[3] See:
https://www.fec.gov/data/disbursements/?data_type=processed&committee_id=C00709113&recipient_name=crisis+relief+consultants&two_year_transaction_period=2022&two_year_transaction_period=2024&two_year_transaction_period=2020 ; Accessed July 17, 2023.

manage a PAC, but rather to enrich Don Wood, Andrew Stefanides, and their cronies with a rich slush fund of at least $309,770.80. Upon information and belief, this number is grossly unreported and does not include the full tally of money that Stefanides and Wood have pilfered from ACCR.

35.    In December of 2020, Dr. Don Wood handed the reigns of Treasurer of ACCR to Andrew Stefanides, but Dr. Don Wood still lists his email address (don@americancoalitionforcrisisrelief.com) as the point of contact for ACCR with the Federal Election Commission. See:

https://docquery.fec.gov/pdf/652/202004209219760652/202004209219760652.pdf

36.    At no time did Dr. Don Wood, Andrew Stefanides, CRC, or ACCR ever treat women with breast cancer.

37.    At no time did Dr. Don Wood, Andrew Stefanides, CRC, or ACCR ever treat Veterans for PTSD.

## V.  PARTIES

38.    The Plaintiff is a natural person and is a resident of Texas.

39.    Plaintiff is a person as that term is defined or referenced by 47 U.S.C. § 153(39).

40.    Upon information and belief, Defendant Don Wood ("Wood") is a natural person and founder of Defendant ACCR and CRC.

41.    Defendant Wood is a person as that term is defined or referenced by 47 U.S.C. § 153(39).

42.    Upon information and belief, Defendant Andrew Stefanides ("Stefanides") is a natural person and Treasurer of Defendant ACCR.

43.    Stefanides is also a Director of Defendant CRC.

8

44.  Defendant Stefanides is a person as that term is defined or referenced by 47 U.S.C. § 153(39).

45.  Defendant ACCR is a person as that term is defined or referenced by 47 U.S.C. § 153(39).

46.  Defendant ACCR is an unknown business entity but ACCR reports to the FEC that its principle place of business is 3626 North Hall Street, Ste. 610, Dallas, TX 75219. See: https://docquery.fec.gov/cgi-bin/forms/C00709113/1674238/; Accessed July 17, 2023.

47.  This principle place of business for ACCR is actually a small virtual office in Dallas, Texas.

48.  Defendant CRC is a Florida business entity with its principal place of business at 1321 W. Main Street Orlando, FL 34748.

49.  Defendants at all times acted by and through one or more of the Agents.

## VI. FACTUAL ALLEGATIONS

50.  Defendants Wood, Stefanides, and ACCR solicit money to pay for women with breast cancer and Veterans with PTSD, but keeps the money for themselves and their fundraisers.

51.  Defendant ACCR masquerades as a legitimate business entity to solicit for Wood's and Stefanides' scam. Wood and Stefanides direct ACCR to place telephone solicitations to consumers for treatment services for women with breast cancer and Veterans with PTSD.

52.  To increase their revenue and avoid paying for legitimate forms of advertising and telemarketing, Wood and Stefanides hired and directed John Doe to market ACCR

9

PAC and produce inbound calls.

53.  John Doe amassed a list of thousands of phone numbers from unknown sources that were believed to be consumer telephone numbers.

54.  John Doe called and played artificial or prerecorded voice messages to thousands of cellular and residential phones at a time.

55.  When Plaintiff answered expecting to hear from a real person, John Doe pulled a bait and switch by playing an artificial or prerecorded voice message.

56.  Defendants respected Plaintiff's time and privacy so little that they did not even hire a real person to call him—they used a machine to play prerecorded messages to thousands of consumers at once.

57.  Defendants hoped that if enough people paid for the "life-saving treatment" as a result of the robocalls, it would justify the annoyance experienced by the recipients of the calls as the "cost of doing business."

58.  Defendants did not possess consent from Plaintiff as required prior to deploying these prohibited messages.

59.  On June 1, 2022, at approximately 5:10 PM ET, Plaintiff received a call on his personal cellular telephone from the phone number (434) 818-0078.

60.  When Plaintiff answered, he immediately heard an artificial voice that said "hello" in a robotic sound.

61.  When Plaintiff responded with, "hello," he heard a click and then background noise that sounded like a busy call center.

62.  Plaintiff then heard a woman's voice that was different from the original "hello" artificial voice.

10

63.  Plaintiff recognized the woman's voice because he has received multiple prerecorded voice calls with the same woman's voice.

64.  The woman was speaking from a script and used the same voice, intonation, and rhythm for each call.

65.  The woman repeated herself identically within the same call in such a way that it was obvious to any listener that the caller was using prerecorded voice.

66.  The woman identified himself as "Sarah Thomas" from the "Breast Cancer Relief Committee PAC."

67.  Sarah Thomas is the name of a real breast cancer survivor who is prominent for achieving an extraordinary accomplishment and giving hope to women across the world.  A year after completing treatment for stage II breast cancer, Sarah Thomas swam the English Channel four times, non-stop.  See: https://www.breastcancer.org/podcast/survivor-swim; Accessed July 19, 2023.

68.  Sarah Thomas maintains a website at https://sarahthomasswims.com/.

69.  Plaintiff has personally verified with the real Sarah Thomas that the audio recording from Defendant ACCR's solicitation call to Plaintiff was not the actual voice of the swimmer Sarah Thomas.

70.  Defendants intended to mislead consumers into believing that the real Sarah Thomas supported the ACCR scam.

71.  The woman asked Plaintiff for money to support women with breast cancer using the following prerecorded voice message:

> *"It's Sarah Thomas for the Breast Cancer Relief Committee PAC.  We're having our fundraising drive and providing donation return envelopes to all supporters. Tragically, one in eight women will get breast cancer, and every day women die because their cancer is not caught in time.  Our hope is for the fast-track approval of life-*

11

> *saving tests and treatment for women with cancer who cannot afford them. So, we need to elect lawmakers with that goal in mind. Now, when you receive your donation return envelope, can we count on you to return a small donation for the drive."*

72.  The caller then transferred Plaintiff to yet another prerecorded voice message system to give the fraudulent appearance that Plaintiff was speaking to a live person.

73.  In fact, Defendants transferred Plaintiff to a prerecorded voice system named "Jackie."

74.  Plaintiff recognized the voice of "Jackie" because he has received multiple prerecorded voice calls with the same woman's voice.

75.  The scripts from Jackie used a prerecorded message to respond to an algorithm of consumer statements and responses.

76.  There is no Political Action Committee registered with the Federal Election Commission as "Breast Cancer Relief Committee PAC." See: https://www.fec.gov/search/?type=candidates&type=committees&type=site&query=breast+cancer+relief+committee; Accessed July 20, 2023.

77.  Defendant American Coalition for Crisis Relief PAC does not report the name "Breast Cancer Relief Committee PAC" to the Federal Election Commission as a connected organization or affiliated committee on Block 6 of their FEC Form 1 statement of organization. See: https://docquery.fec.gov/pdf/658/202301049574284658/202301049574284658.pdf

78.  Defendants deliberately use the phony name of "Breast Cancer Relief Committee" to create confusion for consumers.

79.  The messages did not clearly state the telephone number of such business, other entity, or individual.

12

80.    The calls did not provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request.

81.    Plaintiff was interested in the group so he provided his address to the automated system so that he could learn more about the organization since the prerecorded message did not provide the full name or phone number of the organization.

82.    Plaintiff does not have any account or business with Defendants.

83.    Plaintiff has no pre-existing business relationship with Defendants and never requested by an agreement or otherwise that he be contacted on his personal cellular telephone.

84.    Plaintiff never provided his cellular telephone number to Defendants and never provided his consent to Defendants to be contacted on his cellular telephone.

85.    At no time did the Plaintiff take any action to invite calls from Defendants.

86.    At all times relevant to this Complaint, Plaintiff's phone number is part of the national Do Not Call registry.

87.    Subsequent to the call from Defendants on June 1, 2022, Defendants called Plaintiff at least seven more times after that call.

88.    When Defendants placed the subsequent phone calls to Plaintiff, they had a woman respond with the name of "Jane" from the "Breast Cancer Relief Committee PAC."

89.    The voice of "Jane" was the same voice of the fake "Sarah Thomas" in the initial call.

90.    Defendants continued to call Plaintiff as many as three times a day with prerecorded voice.

91.    Each call contained prerecorded voice that was identical to the other calls. It was

13

obvious to any listener that the call was prerecorded because it includes the same sounding voice, with the exact same script, same rhythm, and same intonation.

92. Defendants placed at least eight (8) calls in total to Plaintiff's personal cellular telephone.

93. Defendants used artificial voice to call Plaintiff on his cellular telephone.

94. Defendants used prerecorded voice to call Plaintiff on his cellular telephone.

95. The telephone number that Defendants used to contact Plaintiff was assigned to Plaintiff's cellular telephone service as specified in 47 U.S.C. § 227(b)(1)(A)(iii).

96. Plaintiff uses this phone for personal purposes, such as listening to music while exercising at home, enjoying weather apps, and to assist with cooking home meals.

97. Plaintiff's cellular telephone has a limited minutes plan, so that when Defendants call Plaintiff, they deplete the minutes on Plaintiff's plan.

98. Defendants did not initiate any call to Plaintiff's cellular telephone number for an emergency purpose.

99. Plaintiff incurred actual damages as a result of Defendants' behavior.

100. Defendants' phone calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

101. Defendants' phone calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

102. Defendants' phone calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone line.

103. Defendants' phone calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

104. Defendants harassed Plaintiff by incessantly calling Plaintiff's telephone.

14

105. Defendants' phone calls harmed Plaintiff by causing Plaintiff aggravation and annoyance.

106. Defendants' phone calls harmed Plaintiff by wasting Plaintiff's time.

107. Defendants' phone calls harmed Plaintiff by depleting the battery life on Plaintiff's cellular telephone.

108. Defendants' phone calls harmed Plaintiff by using data storage space in Plaintiff's cellular telephone.

109. Defendants initiated the telephone calls and messages for the purpose of encouraging Plaintiff to pay for the services for "life-saving treatment" and "testing" for breast cancer.

110. The telephone calls to Plaintiff's cellular telephone number were not initiated by accident or mistake.

111. Defendants do not maintain a written policy for maintaining a do-not-call list.

112. Defendants have not informed and trained personnel engaged in making calls on the use of the do-not-call list.

113. Defendants do not have a registration certificate with the Texas Secretary of State to conduct telephone solicitations in Texas.

114. It is unfair for Defendants to call Plaintiff when Plaintiff listed his number on the Do Not Call Registry.

115. It is unfair for Defendants to call Plaintiff when Defendants lacked consent to call Plaintiff.

## VII.  THEORIES OF LIABILITY AGAINST DEFENDANTS

116. Even if Wood, Stefanides, or ACCR did not personally initiate the TCPA-violating

15

calls, Wood, Stefanides, and ACCR are liable because they took steps to cause the

calls to be made, and the calls were made pursuant to their actual or apparent

authority, and/or ratification. Further, Wood, Stefanides, CRC, and ACCR are

liable for participating in a joint enterprise or acting in concert with John Doe.

117.   Wood and Stefanides are liable for the conduct of ACCR and John Doe because they

know that ACCR is an unregistered entity in Texas.

### DIRECT LIABILITY UNDER THE TCPA

118.   Defendants' scheme involves the use of illegal robocalling to promote their

solicitations.

119.   John Doe is directly liable under the TCPA for calling Plaintiff's phone using an

artificial or prerecorded voice.

120.   Wood, Stefanides, and ACCR are also directly liable under the TCPA for

outsourcing their telemarketing to John Doe.

121.   On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding

that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its
> telemarketing activities to unsupervised third parties would leave consumers
> in many cases without an effective remedy for telemarketing intrusions. This
> would particularly be so if the telemarketers were judgment proof,
> unidentifiable, or located outside the United States, as is often the case. Even
> where third-party telemarketers are identifiable, solvent, and amenable to
> judgment limiting liability to the telemarketer that physically places the call
> would make enforcement in many cases substantially more expensive and less
> efficient, since consumers (or law enforcement agencies) would be required to
> sue each marketer separately in order to obtain effective relief. As the FTC
> noted, because "[s]ellers may have thousands of 'independent' marketers,
> suing one or a few of them is unlikely to make a substantive difference for
> consumer privacy.
> *In re Dish Network*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

## VICARIOUS / AGENCY LIABILITY

122.   The *Dish Network* FCC Ruling rejected a narrow view of TCPA liability, including
       the assertion that a seller's liability requires a finding of formal agency and
       immediate direction and control over the third-party who placed the telemarketing
       call. *Id.* at 6587 n. 107.

123.   Prior to conducting discovery in this litigation, due to the anonymous nature of
       robocalling, Plaintiff has no way to identify the exact parties who called his phone.
       It could have been Wood, Stefanides, ACCR, CRC, or some other unknown
       company John Doe.

124.   However, for the purposes of TCPA liability, Plaintiff is not expected to know this
       information at the pleading stage.

125.   The *Dish Network* FCC Ruling states that called parties may obtain "evidence of these
       kinds of relationships . . . through discovery, if they are not independently privy to
       such information." *Id.* at 6592-593 (¶ 46). Moreover, evidence of circumstances
       pointing to apparent authority on behalf of the telemarketer "should be sufficient to
       place upon the seller the burden of demonstrating that a reasonable consumer would
       not sensibly assume that the telemarketer was acting as the seller's authorized
       agent." *Id.* at 6593 (¶ 46).

## ACTUAL AUTHORITY

126.   Defendants Wood, Stefanides, CRC, and ACCR gave actual authority to John Doe
       to generate prospective customers.

127.   Robocalling was integrated seamlessly into their telephone solicitation process that it
       appeared to outside parties like Plaintiff that John Doe was the telemarketing

17

department of Wood, Stefanides, CRC, and ACCR.

128. Wood, Stefanides, CRC, and ACCR acted in concert with John Doe and have been able to enjoy the benefits of mass robocalling while moving the illegal activity "outside their purview."

129. John Doe had actual authority to make robocalls to Plaintiff on behalf of Wood, Stefanides, CRC, and ACCR.  This is further evidenced by the written correspondence that Plaintiff received from Defendants.

130. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." See *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

131. In their January 4, 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of a prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

132. More specifically, the *Dish Network* FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

## APPARENT AUTHORITY

133. The *Dish Network* FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be

18

within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 FCC Rcd at 6592 (¶ 46).

134.   Wood, Stefanides, CRC, and/or ACCR authorized John Doe to generate

prospective customers for them.

135.   It appeared to Plaintiff that John Doe was one and the same company as Wood,

Stefanides, CRC, and/or ACCR.

136.   Plaintiff reasonably believed and relied on the fact that John Doe had received

permission and instructions from Wood, Stefanides, CRC, and/or ACCR to solicit

for life-saving treatment and testing for breast cancer.

## RATIFICATION

137.   Defendants Wood, Stefanides, CRC, and ACCR actively accepted business that

originated through the illegal robocalls placed by John Doe.

138.   By accepting monies for life-saving treatment pursuant to a robocall, Wood,

Stefanides, CRC, and ACCR "manifest[ed] assent or otherwise consent[ed] . . . to

act" on behalf of Defendant John Doe, as described in the Restatement (Third) of

Agency.

139.   Wood, Stefanides, CRC, and ACCR ratified John Doe's TCPA violations by

knowingly accepting the benefit of Plaintiff as a new customer despite the way

19

Plaintiff was the victim of Defendants' illegal marketing scheme.

140. ACCR permitted their salespeople to solicit prospective customers for Wood, Stefanides, CRC, and ACCR including Plaintiff, while turning a blind eye to the illegal way in which the potential customer was identified.

141. Wood, Stefanides, CRC, and ACCR ratified John Doe's TCPA violations by being willfully ignorant of the violations or by being aware that such knowledge was lacking.

142. The ratification by Wood, Stefanides, CRC, and ACCR caused John Doe to have actual authority under Restatement § 4.01 cmt. b.

## JOINT ENTERPRISE

143. Wood, Stefanides, CRC, and ACCR had a tacit agreement or approved of after the fact with John Doe for the sale of breast cancer testing and life-saving treatment pursuant to John Doe's illegal robocalls.

144. Defendants were part of a common enterprise and had a community of interest in soliciting breast cancer treatment on behalf of Wood, Stefanides, CRC, and ACCR.

145. Wood, Stefanides, CRC, and ACCR had an equal right to control the conduct thereof by specifying the type of people to be called, the questions and scripts that should be employed with prospective consumers, and how to write and execute contracts on behalf of Wood, Stefanides, CRC, and ACCR.

146. Defendants had a duty to exercise due care when placing phone calls and marketing their services.

147. Defendants' violation of the TCPA is negligence per se.

148. Because of Defendants' negligence, Plaintiff suffered actual damages.

20

149. Wood, Stefanides, ACCR, CRC, and John Doe are jointly and severally liable for the resulting damage.

## ACTING IN CONCERT

150. Defendants were part of a common design to robocall consumers and then sell Wood's, Stefanides', CRC's, and ACCR's breast cancer treatment services.

151. Wood, Stefanides, CRC, and ACCR had a tacit understanding that John Doe was robocalling in violation of the TCPA.

152. Wood, Stefanides, CRC, and ACCR knew that John Doe's conduct was a breach of duty to Plaintiff.

153. Wood, Stefanides, CRC, and ACCR gave John Doe substantial assistance in accomplishing the tortious result, including compensating John Doe for generating customers pursuant to robocalls and giving instructions on how to represent them and what to ask the people that had been robocalled.

154. Wood, Stefanides, CRC, and ACCR furthered the tortious conduct by their cooperation with John Doe and adopted John Doe's robocalling and solicitation for their own benefit.

155. Wood's, Stefanides', CRC's and ACCR's own conduct constitutes a breach of duty to Plaintiff.

156. Plaintiff's injury is indivisible.

157. All Defendants acted tortiously, and the harm resulted from the robocalling of John Doe to Plaintiff.

158. Wood, Stefanides, ACCR, CRC, and John Doe are joint and severally liable for the

resulting damages.

### COUNT I – Telephone Consumer Protection Act – 47 U.S.C. § 227(b)(3)

159.    The acts of the Defendants constitute violations of the Telephone Consumer

Protection Act.

160.    Defendants' violations of the TCPA include, but are not limited to, the following:

    i.    Making and/or initiating a telephone call using ean artificial or prerecorded
      voice to any telephone number assigned to a cellular telephone service, in
      violation of 47 U.S.C. § 227(b)(1)(A)(iii).

161.    As a result of Defendants' actions, under 47 U.S.C. § 227(b)(3), Plaintiff is entitled to

an award of statutory damages of $500.00 for each such violation and an injunction

prohibiting future conduct in violation of the TCPA.

162.    Since Defendants' violations were committed willfully and knowingly, Plaintiff

requests an award of statutory damages of $1,500.00 under 47 U.S.C. § 227(b)(3) for

each such violation.

**Wherefore**, the Plaintiff requests judgment against each Defendant for:

    1) Statutory Damages in the amount of $1,500 for "each such violation"
       pursuant to 47 U.S.C. § 227(b)(3);
    2) Injunctive Relief to restrain and enjoin Defendants from initiating phone
       calls using artificial or prerecorded voice to cellular telephones with prior
       express consent.
    3) Referral to the Texas Attorney General for prosecution under 47 U.S.C. §
       227(g).

### COUNT II – Telephone Consumer Protection Act– 47 U.S.C. § 227(c)(5)

163.    The acts of the Defendants constitute violations of the Telephone Consumer

Protection Act, which provides an additional, distinct private right of action at §

227(c)(5).

164.    Defendants' violations of the TCPA include, but are not limited to, the following:

      i.    Placing more than one telephone call to Plaintiff's cellular phone without consent in violation of the TCPA regulations.

47 U.S.C. § 227(c)(5).

165.   As a result of Defendants' actions, under 47 U.S.C. § 227(c)(5), Plaintiff is entitled to an award of statutory damages of $500.00 for each such violation and an injunction prohibiting future conduct in violation of the TCPA.

166.   Since Defendants' violations were committed willfully and knowingly, Plaintiff requests an award of statutory damages of $1,500.00 under 47 U.S.C. § 227(c)(5) for each such violation.

**Wherefore**, the Plaintiff requests judgment against each Defendant for:

    1) Statutory Damages in the amount of $1,500 for each such violation pursuant to 47 U.S.C. § 227(c)(5);
    2) Injunctive Relief to restrain and enjoin Defendants from calling telephone numbers on the National Do Not Call Registry;
    3) Referral to the Texas Attorney General for prosecution under 47 U.S.C. § 227(g).

### COUNT III – TEXAS BUSINESS AND COMMERCE CODE § 305.053 TEXAS STATE TCPA LAW

167.   Texas Business and Commerce Code § 305.053 creates a right of action for "a person who receives a communication that violates [the TCPA as codified at] 47 U.S.C. Section 227 [or] a regulation adopted under that provision ... against the person who originates the communication ...." Tex. Bus. & Com. Code § 305.053(a).

168.   Therefore, the elements of a § 305.053 claim "correspond to the necessary elements for a TCPA claim." *Callier v. GreenSky, Inc.*, No. EP-20-CV-00304-KC, 2021 U.S. Dist. LEXIS 126769, 2021 WL 2688622, at *6 (W.D. Tex. May 10, 2021).

169.   Plaintiff is entitled to an award of at least $500 in damages for each such violation under § 305.053(b)(1).

170. Plaintiff also requests the Court award treble damages based on Defendants' knowing and/or intentional violations under § 305.053(c)(1).

171. Plaintiff also seeks a permanent injunction requiring Defendants to cease placing illegal telemarketing calls.

**Wherefore**, the Plaintiff requests judgment against each Defendant for:

       1) Statutory Damages against Defendants in the amount of $1,500 for each violation of the Telephone Consumer Protection Act (and the regulations adopted thereto) pursuant to § 305.053(c)(1);

       2) Permanent Injunction restraining and enjoining Defendants from placing illegal telemarketing calls.

       3) Injunctive Relief to refer the Court's findings to the County District Attorney for criminal prosecution under Texas Business and Commerce Code § 305.051 and 305.052.

## COUNT IV – TEXAS BUSINESS AND COMMERCE CODE § 302.101 FAILURE TO OBTAIN TEXAS REGISTRATION CERTIFICATE

172. Texas Business and Commerce Code § 302.101 require telemarketers to obtain a registration certificate ... for the business location from which the solicitation is made.

173. Texas Business and Commerce Code § 302.101 states that a person (1) "may not make a telephone solicitation" (a) "from a location in [Texas]" or (b) "to a purchaser located in [Texas]," (2) "unless the [person] holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

174. Defendants do not hold a registration certificate.

175. Plaintiff may exercise a private right of action under Tex. Bus. & Com. Code § 17.50.

176. Plaintiff seeks an award of $5,000 per violation per Tex. Bus. & Com. Code § 302.302(a).

177.   Plaintiff seeks a permanent injunction requiring Defendants to cease placing

telemarketing calls to residents of Texas without a registration certificate.

**Wherefore**, the Plaintiff requests judgment against each Defendant for:

1) Statutory Damages of $5,000 per violation pursuant to Tex. Bus. & Com. Code § 302.302(a);
2) Costs and attorney fees pursuant to Tex. Bus. & Com. Code § 302.302(d);
3) Permanent Injunctive Relief to restrain and enjoin Defendants from placing telemarketing calls to residents of Texas without a registration certificate.

The Plaintiff,
Christopher Laccinole

Christopher M. Laccinole
14356 N. Summerchase Cir.
Willis, TX 77318
chrislaccinole@gmail.com
401.783.0762

# EXHIBIT

# A

# Electronic Articles of Incorporation
# For

**P19000064283**
**FILED**
**July 22, 2019**
**Sec. Of State**
nculligan

CRISIS RELIEF CONSULTANTS, INC.

The undersigned incorporator, for the purpose of forming a Florida
profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

CRISIS RELIEF CONSULTANTS, INC.

## Article II

The principal place of business address:

3622 S. TYLER STREET
DALLAS, TX.   75224

The mailing address of the corporation is:

PO BOX 691782
ORLANDO, FL.   32869

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The number of shares the corporation is authorized to issue is:

1000

## Article V

The name and Florida street address of the registered agent is:

KIRK  SHERWOOD
307 CARTMEL LANE
WINDERMERE, FL.   34786

I certify that I am familiar with and accept the responsibilities of
registered agent.

Registered Agent Signature:   KIRK SHERWOOD

**P19000064283**
**FILED**
**July 22, 2019**
**Sec. Of State**
**nculligan**

## Article VI

The name and address of the incorporator is:

DON WOOD
6307 CARTMEL LANE

WINDERMERE, FL 34786

Electronic Signature of Incorporator:   DON WOOD

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of this corporation and every year thereafter to maintain "active" status.

## Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

Title:   CEO
KIRK  SHERWOOD
3622 S. TYLER STREET
DALLAS, TX.   75224

Title:   P
DON  WOOD
PO BOX 691782
ORLANDO, FL.   32869

Title:   D
CRISIS RELIEF NETWORK, INC.
PO BOX 691782
ORLANDO, FL.   32869

## Article VIII

The effective date for this corporation shall be:

07/15/2019

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

RECEIVED
AUG 16
AUG

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Christopher Laccinole | American Coalition for ~~Crisis Relief Consultants~~ Don Wood, Andrew Stefanides, Crisis Relief Consultants, Inc. |

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

CK

**(b)** County of Residence of First Listed Plaintiff  Montgomery, TX
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Dallas
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

3-23CV-1831L

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☒ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV |
| **REAL PROPERTY** | **LABOR** | | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | | | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | | |
| ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
47 USC 227 Telephone Consumer Protection Act

Brief description of cause:
unwanted telemarketing robocalls

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| Aug 11, 2023 | *[signature]* |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

August 11, 2023

Clerk, US District Court
1100 Commerce Street, Room 1452
Dallas, TX 75242

3-23CV1831-L

Dear Clerk,

Find enclosed a Civil Cover Sheet, Civil Complaint (with Exhibit A), Money Order for $402.00, and four (4) Summons to be issued for each Defendant.  Could you kindly complete your portion of the summons and mail back to me so I can serve this?  I have enclosed a self-addressed stamped envelope so you may mail the issued summons back to me.  Feel free to contact me with any questions.  Thank you very much.

Sincerely,

Chris Laccinole
14356 N. Summerchase Cir.
Willis, TX 77318
chrislaccinole@gmail.com
401.783.0762

RECEIVED

AUG 16 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

PRESS FIRMLY TO SEAL

UNITED STATES
POSTAL SERVICE

PRIORITY MAIL®

Retail

US POSTAGE PAID
$9.65
Origin: 77378
08/11/23
4897400378-07

0 Lb 7.70 Oz
RDC 01

C001

EXPECTED DELIVERY DAY: 08/14/23

SHIP
TO:
1100 COMMERCE ST
DALLAS TX 75242-1001

USPS TRACKING® #

9505 5118 3198 3223 8975 05

scan the QR code.

USPS.COM/PICKUP

EP14F July 2022
OD: 12 1/2 x 9 1/2

FLAT RATE ENV
ONE RATE ■ ANY WEIGHT

TRACKED ■ INSU

PS00001000014

■ Expected delivery date specifi
■ Domestic shipments include $
■ USPS Tracking® service incluc
■ Limited international insuranc
☑ When used internationally, a c

*Insurance does not cover certain items.
Domestic Mail Manual at http://pe.usps.
** See International Mail Manual at http:/

This package is made from post-consumer waste. Please recycle - again.

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

UNITED STATES
POSTAL SERVICE®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

PRIORITY®
★ MAIL ★

FROM:
Chris Laconico
14356 N. Summerchase Cir.
Willis, TX 77318

TO: Civil
US District Court
1100 Commerce Street
Room 1452
Dallas TX 75242

Label 228, March 2016

FOR DOMESTIC AND INTERNATIONAL USE